IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

FILED
MAY 24 2019
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

IN THE MATTER OF THE SEARCH    )    No. 3:19-MJ-2078
OF THE PROPERTY MORE FULLY     )
DESCRIBED IN ATTACHMENT A,     )    **TO BE FILED UNDER SEAL**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Brently White, being first duly sworn, hereby depose and state as follows:

1. This Application and Affiadvit sets forth facts and evidence demonstrating that there is probable cause to believe that evidence, fruits and instrumentalities of the commission of crimes, specifically violations of federal controlled substance laws including but not limited to Title 21, United States Code, Sections 846, Conspiracy To Distribute Controlled Substances, will be found at the targeted location listed below.

2. I am submitting this affidavit in support of a search warrant authorizing a search of Alberto Martinez Beltran's ("BELTRAN") residence located at 5339 Connell St, East Ridge, TN, 37412, hereinafter the "TARGET RESIDENCE," which is more particularly described in Attachment A, for the items specified in Attachment B.

<u>Training and Experience</u>

3. I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1).

4. I have been a special agent ("SA") with the Tennessee Bureau of Investigation since 2017. I am also currently a Task Force Officer ("TFO") with the United States Postal Service. I have received extensive training pertaining to narcotic investigations and the

1

investigations of various crimes which arise from drug trafficking activities. I have become familiar with the methods, operations, and schemes commonly employed by individuals involved in the violation of narcotics statues through my training and prior experience, including previous cases I have investigated with other municipal, state, and federal agents. I have investigated many cases in the Eastern District of Tennessee and elsewhere involving violations of state and federal narcotics statues and, as a result, I have been sucessful in arresting and convicting numerous individuals associated with narcotics distribution. I have been involved in the execution of numerous search warrants dealing with the detection and investigation of federal narcotics violations. I have participated in federal and state wiretap investigations and prosecutions. As a result of these investigations and prosecutions, I have become aware of various methods and techniques utilized by individuals within the Eastern District of Tennessee and elsewhere to sell and distribute controlled substances. I have become familiar with codes, slang terms, and other terminology used to refer to controlled substances by narcotics traffickers within the Eastern District of Tennessee and elsewhere. I am familiar with the operations of illegal drug trafficking organizations in various parts of the world, including the Eastern District of Tennessee, and the Southeastern United States.

5. Based upon my training and experience with narcotics trafficking, money laundering, and criminal investigations, combined with the knowledge and information provided by other law enforcement officers, I know that:

    a. Drug dealers usually keep controlled substances and paraphernalia for packaging, cutting, weighing, transporting, and distributing controlled substances at places under their control, such as their residences, or in the control of their trusted associates. Drug paraphernalia is typically in close proximity to the locations of the controlled substances themselves.

2

b. Persons involved in drug distribution and its related money laundering activities acquire and maintain records related to drug distribution and records relating to the acquisition and disposition of drug proceeds. Drug traffickers commonly create and maintain books, records, receipts, notes, ledgers, and documents reflecting the names, nicknames, addresses, telephone and pager and other contact numbers of their drug trafficking conspirators, including their sources of supply and their customers. These records typically document the following:

   i. amounts of money owed and amounts of drugs purchased by customers, as well as amounts of money owed to and amounts of drugs purchased from sources of supply;

   ii. transportation to acquire and to sell drugs;

   iii. the purchase of drugs, drug packaging supplies, drug paraphernalia, and other assets used to facilitate the acquisition and sale of drugs; and

   iv. the location of storage facilities and other stash locations to store drugs.

c. Drug traffickers commonly profit and amass proceeds from their illicit activity. In order to protect their illegal activity and be able to utilize the profits, they attempt to disguise and legitimize these profits through money laundering activities.

d. Drug traffickers often purchase and/or title assets bought with illegal proceeds in fictitious names, aliases, names of relatives, associates, or business entities, who serve as "nominee" title holders while the criminals actually own and continue to use the assets and exercise dominion and control over the assets.

3

e.     Drug traffickers often engage in legitimate businesses as a "front" to launder drug proceeds. The business front provides a means for the criminal to show that he/she has legitimate income, when, in fact, the income is solely from the criminal activity. Records of such legitimate businesses funded by the proceeds of illegal activity constitute relevant evidence of money laundering offenses.

f.     Drug traffickers maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers.

g.     Drug traffickers and their associates are known to use aliases, fictitious and multiple addresses, and multiple drivers' licenses, as well as maintain records of the same, in order to conceal their true identity and hinder law enforcement investigation of their illegal activity.

h.     Drug traffickers often obtain lines of credit, loans, or mortgages to purchase assets in which they have low equity interest to avoid seizure and forfeiture attempts by law enforcement authorities.

i.     Drug traffickers primarily utilize U.S. currency as the method of conducting their illegal activity. Therefore, drug traffickers often maintain on

hand and have quick access to large amounts of U.S. currency or other liquid assets in order to maintain and finance their ongoing criminal business.

j. Drug traffickers often utilize electronic equipment such as computers, smartphones, tablet computers, currency counting machines, and telephone answering machines to generate, transfer, count, record, and/or store the information described in the preceding paragraphs.

k. Drug traffickers often use telephones to facilitate their drug activities. Records of such telephone calls, including telephone bills, are commonly kept and maintained by the drug traffickers.

l. Drug traffickers often take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product.

m. Drug traffickers commonly maintain firearms, such as handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. These weapons are used to protect and secure their property, drugs, and cash stores from thieves, as drug traffickers are often the victims of robberies and "rip-offs" during a drug or other illegal transaction. Because firearms are in demand by drug dealers, such items are often bartered for drugs or other contraband. Indeed, the law has long recognized that the presence of firearms is relevant and probative of drug crimes, as such are tools of the trade of drug traffickers.

n. Drug traffickers are not unlike other individuals in that they maintain historical documents and records such as those documents, records, and other items described above. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has

5

diminished. These documents, records, and other items described above are often maintained in the places within the criminals' dominion and control, such as their residences, garages, other outbuildings and appurtenances associated with such residences, and curtilage associated with such residences; automobiles, boats, trailers and other vehicles.

### Applicable Case Law

6. The United States Court of Appeals for the Sixth Circuit has held that evidence of drug sales, such as books, records, letters of credit, and electronic media, are likely to be found where drug traffickers live. *United States v. Mendizabel*, 214 Fed. Appx. 496, 499-500 (6th Cir. December 20, 2006)(citing *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)). *See also United States v. Merrell*, 330 Fed. Appx. 556, 562 (6th Cir. 2009); *United States v. Anderson*, 333 Fed. Appx. 17, 22-23 (6th Cir. 2009); *United States v. Gunter*, 555 F.3d 274, 481 (6th Cir. 2009). In *United States v. Goward*, 188 Fed. Appx. 355 (6th Cir. 2006), the court held that a search warrant affidavit containing credible, verified allegations of drug trafficking, verification that defendant lived at the residence, combined with the affiant-officer's experience that drug dealers keep evidence of dealing at their residence, even in the absence of any indication of any wrongdoing occurring at that residence, established probable cause for the issuance of a warrant to search defendant's residence. The court stated that "[w]e are inclined to…side with our sister Circuits in believing that it is a reasonable inference that 'in the case of drug dealers, evidence is likely to be found where the dealers reside.'" *Id.* at 359 (citing *United States v. Frazier*, 423 F.ed 562, 537 (6th Cir. 2005); and *United States v. Miggins*, 302 F.3d 384, 394 (6th Cir. 2002) (citing cases from the First, Second, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits supporting the proposition that evidence of drug trafficking is likely to be found in the residence of the drug dealer).

## Investigation Summary

7. In the fall of 2018, several ounce dealers of methamphetamine ("meth") told law enforcement that their meth supplier was Roy Headrick ("HEADRICK"). Law enforcement investigation into HEADRICK, including text message search warrants and 4 rounds of wiretaps, revealed that HEADRICK's supplier of meth was Rogelio Barajas Jr. ("GORDO.") HEADRICK was observed driving to Georgia and meeting with GORDO on several occassions. On at least one occasion, in February of 2019, HEADRICK and GORDO were intercepted over the wire arranging a time and place to meet, which based on my training and experience, as well as the context of this investigation, I believed to be a planned meeting to exchange cash for meth. GORDO then called Salome Perez-Guzman ("MARIO"), and arranged for MARIO to pick up the meth from GORDO's supplier. GORDO was then observed meeting with HEADRICK, who handed GORDO an envelope. After GORDO received the envelope, GORDO called MARIO and instructed him to "bring it on." MARIO was then observed meeting with HEADRICK and handing HEADRICK a package.

8. On March 25, 2019, after meeting with GORDO, law enforcement pulled over HEADRICK on his way back to his Tennessee home from the Georgia meeting site with GORDO. Law enforcement discovered approximately 18 ounces of meth in HEADRICK's vehicle. HEADRICK then admitted that he had been supplied kilogram quantities of meth by GORDO for several months, and admitted that MARIO often delivered the meth for GORDO.

9. On May 7, 2019, a federal Grand Jury sitting in the Eastern District of Tennessee, returned a sealed indictment against six defendants, including GORDO, MARIO, BELTRAN, and others for conspiracy to possess with the intent to distribute meth in violation of 21 U.S.C. § 846.

## Beltran is a drug dealer and lives at the TARGET RESIDENCE

10. On March 24, 2019, MARIO and BELTRAN were intercepted through a wiretap on MARIO's phone arranging a drug deal. BELTRAN requested that MARIO bring him "Ice." Based on my training and experience, I know that "Ice" is slang for crystal meth. BELTRAN then told MARIO "I am at the house, I'll wait for you at my house." MARIO was then observed driving towards the TARGET RESIDENCE. Law enforcement then observed MARIO's car parked outside the TARGET RESIDENCE, along with a black BMW that law enforcement had previously observed BELTRAN driving.

11. The black BMW, that law enforcement has observed BELTRAN driving on multiple occasions, is registered to the TARGET RESIDENCE in the name of a female.

12. On March 28, 2019, MARIO was intercepted speaking with BELTRAN again. MARIO asked BELTRAN if BELTRAN still wanted "the three?" BELTRAN replied "Only the three, only three, not too much because I will go crazy." MARIO then told BELTRAN he would meet him the following day. During this conversation, and based on the context of this investigation as well as my training and experience, I believe that BELTRAN requested 3 ounces of a controlled substance from MARIO. The following day, MARIO was observed by law enforcement meeting with BELTRAN in a restaurant.

13. On April 5, 2019, BELTRAN was again intercepted requesting "three" from MARIO, and they agreed to meet on April 7, 2019. On April 7, 2019, MARIO was intercepted asking BELTRAN if he was at the restaurant, and BELTRAN told him that he was at the restaurant. Law enforcement observed BELTRAN's black BMW parked at the same restaurant where MARIO and BELTRAN had previously met. Before MARIO could reach the restaurant, law enforcement pulled him over and discovered approximately 3 ounces of cocaine and 12 grams of meth in MARIO's car. After MARIO was arrested, BELTRAN was observed leaving

the restaurant, getting into the black BMW registered to the TARGET RESIDENCE, and driving away.

## CONCLUSION

14. Based on the forgoing, I request that the Court issue the proposed search warrant.

## REQUEST FOR SEALING

15. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Brently White
Special Agent, TBI

Subscribed and sworn to before me on May 15, 2019.

_____
H. BRUCE GUYTON
UNITED STATES MAGISTRATE JUDGE

9

# ATTACHMENT A

## Property to Be Searched

This warrant applies to the property and its curtilages and outbuildings, appurtenances, attached and detached garages and or sheds located at 5339 Connell St, East Ridge, TN, 37412, the "TARGET RESIDENCE." This property is described as follows:

<u>Description</u>: It is a single family, single story residence with a blueish color. See the photo below.



1

# ATTACHMENT B

## Particular Things to be Seized

Packaging material, scales, and items used to weigh, package, measure, and distribute meth; drug paraphernalia; drug records, drug ledgers, account books, notes, names or code names and nicknames, or identifying information reflecting customers, amounts of drugs bought and sold, and amounts of money paid, owed or collected; United States Currency reflecting proceeds of drug sales or monies set aside for the purchase of drugs; financial instruments; safes, lock boxes, lockable money bags, and other containers which can be used to secure and conceal drugs, currency, firearms, proceeds of drug transactions, or records of drug transactions; telephone and address books, notes, cellular telephones, personal computers with hard discs of portable memory devices containing telephone and addresses of co-conspirators or other such records, photographs, or videotapes indicating a criminal association between co-conspirators; records reflecting the identities, addresses, and telephone numbers of customers who use, transport, or distribute meth; safety deposit box keys; financial records relating to sales of meth or the laundering of proceeds from the sale of methamphetamine, and other containers used to store or secrete currency or records described herein; Firearms, ammunition or other weapons used to protect drugs or proceeds of illegal drug sales, or purchased with proceeds from illegal drug sales; Records pertaining to bank accounts, savings accounts, brokerage accounts, any and all stored value cards, and all financial records relating to the concealing of proceeds of the receipt, investment or disbursement of proceeds, including records of domestic and foreign money transactions or records of the transfer of funds within or into and out of the United States; Papers, passports visas or other travel documents, identification cards of papers, driver's licenses, tickets, notes, receipts, and other items relating to travel expenditures; computers, electronic storage

devices, physical keys, encryption devices, dongles, and similar physical items necessary to gain access to computer equipment, electronic storage devices, or data; and any and all items used in the furtherance of distribution of and possession with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 841; and conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841 and 846.